Good morning. Good morning, your honors. Good morning and may it please the court. Hunter Haney for Jerry Boylan. I hope to reserve four minutes for rebuttal and I'll watch my clock. How much time? Four minutes, please. The 2019 Conception Fire was an undeniable tragedy. Today, however, concerns two sets of compounding legal errors that prejudicially impaired the trial defenses of the Conceptions Captain, Mr. Boylan. First, misinstructing the jury regarding civil regulations and the required culpable acts, mental state, and causation standards for Siemens manslaughter, and second, permitting inadmissible expert testimony to meet those reduced burdens. Unless the court prefers otherwise, I'll address each of those points in order. The criminal law abhors negligence per se convictions, but the court here encouraged that outcome in three ways. First, instructing that the regulations set forth the standard of care, calling attention to the regulations over other evidence, and inventing a multi-factor test for weighing their significance. The regulations played an outsized role in this trial and in the instructions comprising over a half-page of single-space text in the instructions, harmfully reducing Mr. Boylan's industry standard evidence to a mere afterthought. Well, let me ask you this. If we were to interpret the statute and find that the statute only requires negligence, it would seem to me that the instruction issue somewhat goes away because under the instruction, your argument would be that, I think there's an argument under the instruction that they found gross negligence as well as with the misconduct and or gross negligence. But if we interpret the statute, it hasn't been interpreted in the Ninth Circuit. It has been interpreted in another statute, and they found that to be merely negligence as the standard, correct? Correct. So if we were to similarly find like the other circuit, it would seem to me that your argument on the instructions would go away. So that's the second argument we're making. The first argument we're making doesn't really turn on the correct negligence standard. It turns on ultimately under this court's decisions in Wolf and White Eagle on the principle that regulations cannot supply a critical offense element here. Whatever the sort of level of negligence was, regulations cannot do that because in effect, it tells the jury quite powerfully using these statements of law that this – that the – But the instruction that was given said you – it didn't say that a regulation means per se that you violated the law, right? But it's some evidence. It said that the regulations constituted the standard of care. It set forth the standard of care, and then it proceeded to list the regulations. It said the mere fact that the defendant violated a regulation is not by itself sufficient to establish a violation of Section 1115. Yes, and prior to that, it then said for – it said that it set forth the standard of care, and there's a real tension there, right? And the same exact problem occurred in Wolf. The court instructed very similarly that the regulations were mere background evidence, and the court still determined as here that the regulations overwhelmed the trial given the role in the government's case. But it also – the jury instructions also said you may consider whether the defendant failed to comply with one or more of those regulations, and if so, whether that or those failures provide evidence as to one or more of the elements of Section – of the Section 1115 crime. And there was no question that the regulations could provide evidence. They were admitted into evidence. There was no disagreement as to the fact that they could constitute evidence. The issue is that in the totality, as in Wolf and White Eagle, several other cases we've set forth from out of circuit, the regulations were basically – in effect dwarfed Mr. Boylan's contrary industry standard evidence. The government's experts emphasized the regulations' importance. They equated the violations with negligence and misconduct, effectively stating that they were the cause of death. They were used in opening and closing 23 distinct times and negligence. Well, but we're not talking about a case where, let's just say hypothetically, that your client had violated a statute that said you should only eat at a certain time or, you know, that there was – you know, all of the statutes that were in there had to do with safety issues, training issues, all of those. So it seems that it's a difficult argument for you to make that the statutes that – it doesn't per se come to the conclusion, but these statutes seem pretty relevant to what happened here. Their relevance is not in question. They were never in question in Wolf and White Eagle either. There's no question they could have been admitted here. It's just that they were improperly used and framed by the courts. That's what I'm trying to say, how, because they can try their case. Regulations are significant. This is a police case, use of force. You would go through all the training and regulations that police officers would receive, whether they were negligent or not, or shooting someone. Why is that different here? Because the instruction took the issue basically away from the juror and afforded the regulations an outsized role. But even if a court disagrees – Fair enough. I don't want to get you too bogged down, but you keep saying that. I'm trying to understand what part of the instruction did what you say. The instruction looking at ER 138 that the Secretary of Homeland Security has issued regulations, some of which set forth the standards of care and safety precautions to protect against hazards on vessels. And it goes through and it lists the instructions. The First Circuit in Moffitt, a case we said in our reply brief, also found that listing instructions – I mean, sorry, listing regulations in the way that the court did here, again, afforded the government's evidence a higher status. And here, of course, this is evidence that is a force of law over the defense's contrary theory. But even if the court were to disagree on this point, as Your Honor referenced, the court further – But what about the introductory instructions? They say the evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness, the exhibits received in evidence, any facts to which the parties have agreed. You know, even this –  ER 139, you must consider all of the relevant evidence regarding the existence or nonexistence of gross negligence and the other elements of Section 1115. Sure. And again, the point that we're making is not solely about the instructional language. It's also about just the use of the evidence throughout the trial. It's – and that's what really animates the decisions in Wolf and White Eagle. But even if the court were to disagree with us, the court furthered by instructing on this binary question of whether Siemens manslaughter could be satisfied by misconduct and or gross negligence. Sort of setting aside whether the law of the case or waiver applies, manslaughter statutes usually require gross negligence and Siemens manslaughter is no exception to that rule. And the court erred under Garcia for – California has a misdemeanor manslaughter for driving. If you just turn left, if you commit any infraction and someone dies. So it's not unheard of that there are criminal statutes that are negligent. And Gomez-Leon does a very helpful survey of statutes nationwide and those statutes exist, but the vast majority, the common law tradition – What's the point of having 1115 if it's just 1112? 1115 is specific to captains of  Correct, Your Honor. Right? If we just wanted this just to be involuntary manslaughter, there'd be no need for a separate statute. Well, there are – And Congress specifically in text chose not to say gross negligence, chose to just say negligence. Yes. So it did – there are a couple sort of parts to that question there and I want to make sure I get to all of them. The enhanced penalties in the statute speak to the difference, right? There's a 10-year penalty here versus an eight-year penalty for the involuntary manslaughter statute and that is enough to incentivize cautiousness. And similar policy arguments, I'll note, were rejected in Ruan and Rahafe as not really relevant to the question of the proper mental state. And I know Your Honor referenced Alvarez and O'Keefe earlier as existing sort of contrary precedent, but those courts did not really have an opportunity to thoroughly – If we want to talk about the penalties, involuntary manslaughter is imprisonment not more than eight years, but this semen manslaughter is not more than 10 years. Correct. So why wouldn't it be consistent that Congress would have a lower bar to be convicted of the semens if they're going to give you 10 years? Because Congress, again, knows the background assumptions that traditionally are imported from the common law when it legislates. And that includes – Well, when people go out to sea and they're under a captain, I mean, they're in – arguably they're in a particularly vulnerable situation because you're not right where you can call 911 and everyone gets there. And so putting more on a captain to make sure that there are safety regulations in place, it doesn't seem odd to me. But let's assume a lot of the errors that you – I know that you also attack the expert witnesses and the court basically said, hey, these people are experts, but you can cross-examine them. It basically goes more to the weight than to the admissibility. Then we've got to interpret – if we interpret the statute, is just negligence enough? Or then if we don't interpret the statute and go with the jury instructions, was it confusing or could they have convicted on some theory that would not be correct? At the end of the day, if we say you've made some errors, we still would have to look at the entirety of the evidence to analyze it all for harmless or prejudicial error, right? So maybe you could help me here on – that it would seem that there's some pretty damning, undisputed evidence in the record about the lack of training of people and the lack of things that it would seem that it would be hard for a jury to do anything other than to convict even if there had been some errors because you had – of the crew, they were very untrained. It seems undisputed. They didn't know where certain things were. They didn't – they walked by the station, what the station that could have hooked up to. They didn't know where that was. And at best, it seems that perhaps the captain had a short huddle with people, tried to get people out, and then went overboard and they evacuated pretty quickly. So what is in the evidence? It just seems pretty undisputed that there was just a total lack of training and that this crew didn't – that the captain vacated pretty darn quickly and that after that, the people that he had had no training, were walking by things. There was only one fire extinguisher, I believe, that was used. There were other fire extinguishers that could – if people had known where they were or there was a life-saving station, what in the evidence is there that could show that this would not be harmless error? So, Your Honor, I think that's a very accurate summary of the government's case. I think if we were here on sufficiency review, we could perhaps agree that maybe the evidence was legally sufficient. But if we're here on harmlessness review – Well, but they're going to argue the evidence is overwhelming and any mistake – So, the government argues that – – would end up made a second of difference. The government argues that in a completely conclusory way and it's brief and that's not sufficient under Rodriguez to demonstrate harmlessness. These are facts, okay? There are six fire extinguishers. Only one out of six was used and it was used by a passenger, okay? There are two fire stations with 50-foot fire hoses. Not a single one was used. The fire axe was not used. The public address system was never used to alert the passengers of the fire or give them instructions. These are not conclusions. Right? So, the defense – So, why wouldn't there be harmless error if Captain Boylan, first to abandon ship, doesn't even notify any of the passengers that there's a fire and the PA system is right next to the phone where he called the Coast Guard? He stayed on the ship until he was actually on fire and then left the ship and then reported. It was not clear whether he was on fire. One witness said that smoke was trailing after him. Well, they said they saw smoke was behind him. But the fact that he never bothered to even give notice to passengers using the public address system? It's unclear that the public address system would have had a difference given the fact that the passengers were – But you don't assume that he didn't bother to give any notice to passengers that there was a fire. He was doing exactly what the Coast Guard and the station bill required, which was to direct fire suppression efforts and to call the Coast Guard given that the fire was already out of control. Right. Of the fire suppression efforts of the crew, including the captain, none of five fire extinguishers were used. No fire stations were used. Again, the – No 50-foot fire hoses were used. No fire axe was used. The crew was attempting to get to those items to use them. 50, right? They had time to all jump overboard immediately to have monitor – After they were trapped by the fire. And then back and get a skiff off the boat. After they were – And get the skiff back onto the water and they were all able to get on the skiff and go to safety. I guess I agree with Judge Callahan is what is your best argument that harmless error doesn't apply here? So as to the negligence question, the question of course is gross negligence, no one knowing of facts that reasonably indicated a substantial and unjustifiable risk to human life as the court defined it. But let me – And here we – Let me ask you with that question. Yes. So it says misconduct and or acted with gross negligence, which means acting with wanton or reckless disregard for human life. There's no comma after gross negligence. I would agree if there were a comma after gross negligence, then the phrase which means acting with wanton or reckless disregard for human life would describe only gross negligence and not misconduct. I don't – So I want to make sure I address your honor's harmless error question too. But on that point, I mean I do think that there's, you know, a couple of things. Wanton and reckless disregard is of course the legal definition of gross negligence. It's not the definition of misconduct as we've shown in our briefs. Also disjunctive terms are presumptively given separate meaning and there's a which means of course limiting clause which in this context I think presumptively applies to the phrase that it follows under Lockhart. So I – And I think as a matter of simple grammar, it would say – the language would say which mean rather than which means if it was referring to multiple terms. The instructions also use different verbs, acting versus engaged and so on. Can I ask one last question on the – your regulation? You can ask – Sorry. This is my last question. I'll give you some time for – The coastal regulations, they're not limited to large or small vessels, right? They just say vessels. The regulations were the T regulations which are specific to this type of vessel. It's a specific section of the Code of Regulations of a certain size. And there was testimony on that at trial. If I look at all of the regulations, they just say vessel. I – So you're – I'm sorry. So you're saying none of these regulations apply to small vessels. They only apply to large vessels? No, no, no. The regulations apply only to small dive vessels like this under the T regulations. Okay. But even Mr. Tortoro who is the expert said that he does provide training regarding small vessels as part of his experience, correct? He teaches courses regarding it. Small vessels? Yes, regarding small vessels, but he had no industry experience in that regard. But just to sort of turn back, so I want to make sure I can answer the question about harmlessness, the defense presented several witnesses demonstrating that Mr. Boylan followed the operating practices of the industry that were deemed safe for decades. This is how everyone operated. Roving patrols were unpracticed and unfamiliar even to the Coast Guard, and so were battery fires. The bottom line is that boats were too resource strapped at the time to – and focused on daytime emergencies, which were the vast majority of emergencies that had occurred up to that point. There was limited time for training given the 16-hour days and company resources, but Mr. Boylan, as with everyone else in the industry, made the best of what he had. He did orient his crew and he did give safety briefings and he did make sure that the crew members knew the emergency equipment. The government's witnesses, including Matthew Kertu – But they walked past it. They didn't even – they couldn't even find any. So Mikey Coles did walk past it once as he was attempting to go get the fire extinguishers, which was his duty. He was – and I'll emphasize it was his duty because it was actually required by the Coast Guard under the station bill that he was to get the fire extinguishers. The other crew members who were responsible for the fire hoses did not make it in time, and that's because the fire was spreading so rapidly. So the bottom line is everyone was doing what they were required to do and that they were trained to do. And they were trained on that – those specific items. But the bottom line is that the egresses, because of the location of the fire, were immediately blocked in by flames. Both of the egresses were inside of the salon, and the fire, of course, happened – whether it happened in the trash can or happened at the back of the salon – happened in a way where it blocked the only exit in immediately. So no fire – But the passengers couldn't – they died of smoke inhalation. They couldn't – the fire wasn't there. It was on the other side, right? The fire was above them. But they couldn't – they couldn't get to it. Correct, Your Honor. Yes. They were trapped inside because of the construction of the boat and the speed of the fire, basically.  Okay. Let me find out – do you have any more questions? No. Thank you. Okay. So we've taken you over. I will give you three minutes for rebuttal. Thank you, Your Honors. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Alexander Robbins on behalf of the United States. With the Court's permission, I would like to start with a big-picture observation on the harmless error point that was discussed, and I realize I'm going backwards, and I realize that the jury was correctly instructed, and I would like to address some of my colleague's  But big picture, I think it's important to take a step back, looking at the totality of the record, looking at what was actually argued before the jury in that courtroom two years ago. None of the errors that we are splitting here today about different standards of causation or different standards of misconduct versus gross negligence or the placement of a comma in the jury instructions had anything to do with what was before that jury. If the Court looks from the first part of the closing argument, from the first thing that the jury heard from the government in closing argument at 31, 39 in the record, to 90 pages later, the last thing that the jury heard from the government, it was about gross negligence, and it was about causation. The words were gross negligence, in fact, in the very end of the government's statement. Can I ask you about causation? How should we find harmlessness or harmless error on actual causation if the government conceded to the district court that you couldn't prove actual causation, and you even conceded to the district court that the main model jury instruction was textbook proximate cause instruction? So you even conceded the instruction given was not an actual cause instruction. It was a purely proximate cause instruction. I appreciate the chance to address that, Your Honor, because we did not concede anything with respect to the but-for causation issue. I want to just give the Court a few sites to look at later if you would like. In our brief at page 44, note 20, we cite a number of parts in the record relevant to this on page 44, note 20 in our brief. In the blue brief on page 47, the site to the record, 179, there was no concession. What happened was that the government stated at page 197, the government stated that if it was the weekend before trial, and I guess it was the Monday of the first week of trial, that if the defense that wanted to make this argument, I'm quoting, should have been made in a motion to dismiss the indictment because the government cannot allege nor can approve actual cause in this case, following the word because. The government, maybe not artfully worded, again, people are on very little sleep and they're doing jury instructions. The government said that if the defense wanted to make this causation argument, it should have been in a motion to dismiss based on that reasoning. Then the government explained and addressed this, the fact that that whole phrase comes after the word because at page 154 in the excerpts, also in front of the district court, to clear that up. Then the district court agreed on page 466, said to the defense, I think you're misinterpreting what they're saying. The government did not concede that. But at ER 197, the government in its brief did say the government did not allege nor can approve actual cause in this case. And you're saying that was artfully worded? We did not concede. We, in fact, did prove but for actual cause in this case. We also proved substantial factor cause under Maine. We proved both. I would like, again, to just point the court. Okay. Separate from what you proved, what did the court instruct the jury to find? This is my concern. Barrage and Maine clearly require both but for actual and proximate cause. Yes. And when I read Maine, that model jury instruction is just a proximate cause instruction. And so my concern is that's the only one given in the jury instruction. It appears that there's not an actual cause instruction. And if I look at the Ninth Circuit's model involuntary manslaughter instruction, it looks like that also is missing an actual cause instruction. So is it the government's position that the Ninth Circuit's model instruction for involuntary manslaughter is legally erroneous under Barrage and Maine? And would that error also be present here? I think we disagree with the premise of Groner's question. Because Maine does contain an actual cause or cause in fact component. It also contains a proximate cause component. I agree it's not perfectly worded. When you say it incorporates both, are you referring to the model or the best formulation that's given at the very end of the decision? Is that what you're referring to?  Are you referring to the text? I'm referring to that. So what Maine does is it discusses both of the – it discusses both – just to take one step back. It's cause in fact and actual cause in the case law. And I've always said Burrage, Barrage is synonymous. Maine discusses actual cause. It uses – Judge Noonan used the term cause in fact. And it also discusses proximate cause or reasonable foreseeability. Maine discusses both of those threads of the case law. And in fact, if you look at the beginning of Maine, the instruction that the defense proposed that was rejected by the district court actually more clearly sets out those two different strands. Maine is discussing both of those things. Barrage, Burrage, then – The actual proposed jury instruction language given in Maine, would you agree that that refers solely to proximate cause? I do not agree with that, Your Honor. That refers to both. Maine discusses cause in fact and adopts as its cause in fact standard the substantial fact or substantial factor, cause in fact, actual cause standard that is expressly acknowledged in Burrage as the minority rule. Burrage – Can I just read it though? The prosecution must prove that the defendant's act or admission was the proximate cause of the death of the victim. A proximate cause is one which played a substantial part in bringing about the death so that the death was the direct result or a reasonably probable consequence of the defendant's speed or condition or manner of driving. That to me is a proximate cause instruction and not a cause in fact. I agree with Your Honor that it is confusingly worded to the extent that it appears to be a definition of one thing following from another. In the same way, for example, as the 1112 instruction this court uses says without due care and then follows it up with a definition that restricts it to reckless and wanton disregard. Jury instructions do that sometimes. I'm not defending the wording of the instruction. I'm defending it as binding and precedential. And what I'm saying is that in both the face of Maine as well as Burrage in its discussion of this very issue makes clear Burrage has a lengthy discussion of substantial part or substantial factor not as part of the proximate cause definition but as an alternative rule for evaluating actual cause or cause in fact. And that's why we use both Burrage and Maine in our background description of the issue. I would also point the court in Maine itself to page 1048, towards the end of 1048, when the court sets forth what the defense asked for in that case, and actually that is a more clear example of the two different parts you're talking about. The defense asked for an instruction that was rejected that required a substantial part I'm looking at the instruction that was given at ER 138 and it says the proximate cause is one that played a substantial part in bringing about the death so that the death was the direct result or a reasonably probable consequence of the defendant's misconduct and or gross negligence. So this to me doesn't seem like an actual causation requirement. It frankly doesn't even seem like a substantial factor requirement because you can convict just based on a reasonably probable consequence, which seems like it's just talking about foreseeability. It's not talking about actual cause. It's just what was reasonably probable. So the part that we are, and again I, the part we're focused on, that I'm focusing on is substantial part, which substantial part and substantial factor are discussed synonymously by Justice Scalia and the Supreme Court in Burrage and also discussed in Maine, although more briefly, as the cause in fact component and I don't want to go too far down the rabbit hole on this because I agree it's not the most well worded in the sense that the restrictions that are here. I'm sorry to interrupt you, but doesn't it define substantial part as reasonably probable consequence? And that seems like a lower standard to me than substantial factor. I respectfully disagree. It says substantial part in bringing about the death so that the death was a direct result or the reasonably probable consequence. That's the confusing part and that's the part that I'm trying to articulate to the court that was actually more clearly stated in the defense proposed instructions, also discussed in Maine, and we know that it's a separate cause in fact, actual cause standard, substantial part, substantial factor, because it's discussed at length by the Supreme Court in Burrage. I also think. But Burrage says you only go to the lower substantial factor causation if Congress uses the phrase contributes to. So no, it contributes to. If Congress uses, you know, but for, or I'm sorry, other language like results from, based on, because of, that is actual cause. So contributes to is a separate, much lower standard. That's the standard that was squarely rejected in Burrage. That was the standard that was given by the Eighth Circuit or the district court rejected by the Supreme Court in Burrage. Right, so we can't have substantial factor. You can't use contribute. We can't use substantial factor. No, I think that's. Because that contributes to is what results in a substantial factor causation standard. Contributes to is a much lower standard than substantial factor or substantial part, which the Supreme Court explains could be anything that incrementally contributes to, whereas the Supreme Court in Burrage recognizes the minority rule that substantial factor or substantial part is another version of evaluating actual cause. In our discussion, our brief, we attempt to give some examples of where it's not necessarily lower. They're just different standards. Two fires that both independent. What do you, so are you conceding that it was a little bit confusing? Your Honor, I would not accuse this court's binding precedent of being confusing. I don't think it was confusing in context at all. The jury understood what it had to find. Confusing in context is different than confusing. I think that a clearer response to Judge Koh's concerns, which I certainly shared the first couple of times I read this, what is seen in Maine itself in the defense instruction and in the Supreme Court's discussion of the two different parts in Burrage. Well, let me go to what your experts testified and what you argued. Now, did the experts say that it was the actual cause? No, they did not say actual cause or substantial cause. They just said caused and led to the deaths. This was the point I was attempting to make at the beginning. To the extent there are errors to be split here, to the extent that there are tricky legal questions about which version of a causation standard to use, none of that affected, not just wasn't prejudicial, it literally did not affect a single word of either party's closing argument over 90 transcript pages with the sole exception of when the government read verbatim that one sentence. It didn't affect the arguments. It didn't affect how the parties framed the arguments. It didn't affect anything. It was literally irrelevant to the jury's determination which of these two standards to use. I would, again, if the court would like to take a look, the 31-39, the government opens by talking about misconduct as being synonymous with gross negligence, which goes to the other point, and 32-27, the last thing the jury heard from the government was that the gross negligence was synonymous with the deaths of those 34 people. Your friend on the other side alleges that the people basically weren't qualified, but the judge said, no, these are all qualified witnesses, the experts are qualified, but you can cross-examine them, and so it basically didn't go to the admissibility, it goes to the weight, and that can all be argued. Yes, ma'am. Hypothetically, I'm asking you hypothetically, that if we were to say, oh, these experts were not qualified and should not have been allowed to testify, how does that put the government, where would the government be in terms of arguing harmless error? If that were, let's just say hypothetically, if we were to go there. Two responses, Your Honor. The first is, if you look at our statement of facts, many of which, many of the facts of which were discussed by Your Honors with my colleague a couple minutes ago, none of that comes from the experts. The story in this case, the story that we put in our statement of facts, comes from the recipient witnesses, the surviving four crew members who testified at trial. Second, there wasn't an issue below, and I don't understand my colleague to be raising one now about the qualifications of the expert. My colleague challenges, and they challenged below, a number of, although not all, but a number of the opinions, the reliability findings, and the bases for reliability of those opinions that were given, and I think to the extent we're talking about particular expert opinions, we need to look at the particular opinion, and some of them are in plain error, some of them are de novo, but in all events, they were properly admitted, and I'm happy to address particular opinions. I think the big ones are the multiple different fire tests that the ATF fire experts ran, the hundred-some small tests. Okay, you're talking around me here. Hypothetically, I'm just saying hypothetically, that if we were to find they shouldn't have been admitted, which is what they were asking, don't let those witnesses testify, right? I think it was as to these certain things, but let's just say completely, no experts at all. So without that evidence, where does that leave you? There's no change, because Captain Tortora testified about prudent seamanship, which was, I don't want to say duplicative, because it was relevant evidence, but it was consistent with everything that the jury had heard over the last two weeks of testimony about what was required by common sense, what was required by prudent seamanship, and what was required by the regulations, and the ATF fire experts testified primarily about the location of the fire. The big issue, I think, was whether it was under the stairs. You're still talking about what they testified to. If that testimony is not there, where does that leave you? A conviction, based on any cause standard you could use. In other words, the experts... No, without the experts, what evidence do you have of causation? Oh, the fact that anyone who was awake on a 75-foot boat would have seen a fire at night and caught it before it grew. Common sense, as well as the example of the Vinson case that was admitted in evidence. The defense argument here, and again, I refer your Honor to the closing arguments, because it gives a very good overview of what was actually before the jury, what they actually cared about at trial. The defense argument was, this was an impossible situation. I think the defense reply brief on page five says, this was an impossibly fast-moving fire. No one could have done anything about it. If that were true, the defendant would have been acquitted. It was obviously not true, because if anyone had been awake on that boat for the however long, 30 minutes, 20 minutes, 40 minutes, it takes a small fire to grow into a big fire, they would have caught it and put it out. If they had known where the fire equipment was, if they had known where the hoses were, they might have been able to put it out later. If the captain hadn't been the first to abandon ship and jump overboard without telling his 33 passengers and one crew member who were trapped below that he was leaving them, at least one person might have been saved. That's the causation evidence. The causation evidence is... That's what I was asking you. I appreciate the chance to give my answer, Your Honor. About Captain Tortoro's testimony that Captain Boylan caused the death of the 34... The 33 passengers and the one crew member. If that is common sense, then it wouldn't meet Diaz's requirement for an expert opinion, because it wouldn't be something beyond a layperson's understanding. It wouldn't be a professional opinion. And if it is going to the heart of the most important issue in the case, then under Valencia Lopez, it can't be harmless error. So do you want to address those two points? Yes, Your Honor. I think both components of that are wrong. In particular, there's a Supreme Court Diaz case, which is a 704B ultimate issue case. And Valencia Lopez, I think, is also a 704B ultimate issue. Remember, Rule 704 abolished the common law rule and said that you can have expert testimony that encompasses the ultimate issue, but you can't have expert testimony in a criminal case on an intent element. So not causation, intent elements. That's what is going on in Valencia Lopez and Diaz. This Court has a Diaz opinion as well that we cite in our discussion of this issue, the Ninth Circuit's Diaz, which is about a... That was the one about the prescribing drugs outside the scope of ordinary medical practice. Not a 704B issue. That was a sort of 704A, Rule 403 issue, and has a different standard for when you can have an expert give an opinion that may substantially overlap with one of the elements. In that case, exactly overlapped with one of the elements. And the Court's explanation was, holding was, you can have that when it's a sort of straightforward, vernacular, colloquial articulation of a conclusion. And the expert is not giving something that sort of is only relevant to a legal element, right? Is taking over the jury's role. And in that case, it was... This is outside this normal medical practice. In our case, it was lack of a roving patrol led to the deaths of those 34 people. It's squarely within this Court's Diaz, and again, not a 704B issue. It's a 704A. But do you see there's any tension? Because in response to Judge Callahan's question, you said, yes, even without expert testimony, there would be sufficient evidence of causation based on the other non-expert testimony. And so, then why would you need expert testimony? Do you see there's a little bit of tension there? The other Diaz case, I mean, that's pretty specific, right? Prescription medications and that. I mean, that has very much a medical expertise that may not be present here. I think it's helpful in the sense that, and I guess there's a... Rule 702 requires helpfulness. There are things that are widely known among people who know that might not be known by any random juror. Maybe some of the jurors know, but some don't. So I was thinking off the top, things that we have professional interaction with, right? Most Supreme Court decisions are decided unanimously. Most decisions of this Court are decided unanimously. Everybody knows that, but a juror might not if it were relevant somehow. Fire is extremely dangerous to see. Like everybody in the boating world knows that, but not all jurors. Maybe jurors have never been on a boat before, have never given any thought to this. So what Captain Tortora did was give helpful, under 702, background contextual information to jurors who might not have any familiarity with boating or what you're supposed to do at sea. And it was particularly relevant given that the defense here was the sort of everyone speeds defense, that everyone does it. Again, look at the defense closing and what my colleague set up here, is that it was unpredictable that fire could burn a boat down at sea. No one saw this coming. This was unprecedented. All these things are wrong, but that was the defense argument of the jury, and the government was entitled to have someone who knew something about boating, as well as other boat captains, to say that that was wrong. I mean, it seems to me, counsel, this was, in effect, a duty of care case, and in every duty of care case, when there's a professional involved, like a captain, you have an expert come in and talk about, whether it's a doctor or a lawyer or a professional, you have someone come and testify what the duties of the job are. I agree completely, Your Honor, and Captain Tortora provided that. All right. Do either of my colleagues have any additional? All right. We've taken you over, but thank you. Thank you, Your Honor. I would ask this Court to affirm the conviction. Thank you, Your Honor. Just a couple of points. Regarding the government's concession, to go back to the beginning, this wasn't just a matter of inartful wording. I'd point the Court to EDR-197, not only to the concession about actual cause, but just putting a couple lines down, the government said that a finding on, if actual cause is included in these instructions, and I'm quoting, that is a finding that would result in an acquittal that the government could not appeal. This was a clear concession to the lower court, and it had legal and factual significance, because as Your Honors pointed out, the reasonable probable consequence language in the instruction essentially allowed the jury to convict on a much lesser standard. That is a standard that's been equated by this Court with materiality, just a likely outcome, and the Court in Maine said that. The jury could have found death on this record was a likely outcome of a roving patrol, but that a roving patrol would not have been life-saving under the circumstances, and that was because all evidence showed that the fire originated and it spread in a way that immediately blocked the egresses. The government experts said that the roving patrol standard was hourly, and that a larger salon fire would have been harder to extinguish, and just to turn back to the hose again, a point I was thinking about while I was sitting down, that even if Mr. Coles could have retrieved the fire hoses, which were immediately made inaccessible by the fire, they had to be uncoiled to actually be effectively operated and turned on. We know causation was an important aspect of this case because the jury's final note inquired about it, and secondly, just to sort of pivot to the expert issue, pre-trial the government represented, this is at ER 3520 and 21, that the timing and the location of the fire was important, and the crux of its causation arguments, and so it needed this expert testimony, these origin opinions, and then of course, Captain Titor's testimony to sort of fill in the gap regarding that unknown time period when no one was awake. That is a gap, of course, that none of the crew members could of course speak to. I'd also like to emphasize in Maine, there's a specific passage at 1049 to 50, that causation is a quintessential factual question that the jury is peculiarly qualified to resolve in all criminal cases. Even if the court here thinks that maybe but for cause is satisfied, and the court in Maine indicated strongly that it thought proximate causation could have been satisfied on the record, this is an issue that should not have been removed from the jury ultimately. That's directly from Maine. So, seeing that I'm out of time, if I may just briefly wrap up, unless the court has any further questions, thank you. The Conception Fire tragically affected many people, and in these circumstances, the easiest course may seem to be to overlook the or excuse them as harmless, but that would be a grave mistake. The public interest in ensuring a fair trial is at its zenith in high-profile cases like this one, and Mr. Boylan should have been permitted an opportunity to fully pursue his defense with a properly instructed jury, and removed from the cloud of inadmissible expert testimony. And without that, the court and the public cannot have confidence in the verdict. The conviction should be vacated. All right, thank you both for your very helpful argument in this case. This matter will stand submitted, and we realize that this is a difficult argument for everyone to sit and listen to, and we appreciate the all the people in the audience listening carefully to the arguments that are made before the court. This court is in recess till tomorrow at 9 a.m. All rise. This court stands in recess until 9 a.m. tomorrow morning.
judges: CALLAHAN, OWENS, KOH